```
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MARYLAND
                                 :
BARRY D. BRAAN, SR.
                                 :
    v.                           :   Civil Action No. DKC 21-2023
                                 :
UNIVERSITY OF MARYLAND MEDICAL
SYSTEM CORPORATION, et al.       :
```

**MEMORANDUM OPINION**

This case arises out of the association of Plaintiff Barry D. Braan, Sr. with the chaplaincy program at the Charles County Regional Medical Center. Presently pending and ready for resolution is the motion to dismiss filed by the four Defendants, University of Maryland Medical System Corporation ("UMMS"), Joan Crittenden, Susan Vogel, and Anne Weekley. (ECF No. 18). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted.

**I.   Background**

Plaintiff Barry D. Braan, Sr., filed a Complaint against Defendants on August 10, 2021, purporting to assert claims for copyright infringements and invoking federal question and supplemental jurisdiction. (ECF No. 1). After some delays for various reasons, he filed an Amended Complaint on December 16, 2022, alleging claims of copyright infringement, tortious

interference with prospective advantage, quantum meruit, unjust enrichment, and violations of the First Amendment to the United States Constitution and the Maryland Declaration of Rights. (ECF No. 17).  The Amended Complaint alleges the following facts.

Plaintiff is a minister, healthcare chaplain, and board-certified pastoral counselor.  (*Id.* at ¶ 1).  In August 2014, Plaintiff brought his wife for treatment to the University of Maryland Charles County Regional Medical Center (the "Medical Center"), a "component and arm" of UMMS. (*Id.* at ¶¶ 2, 13).  While there, he had trouble locating a chaplain to obtain counseling services. (*Id.* at ¶¶ 13-15).  He provided his contact information to a staff member who promised to connect him with the chaplain. (*Id.* at ¶ 15).  One year later, in or about September 2015, Plaintiff was contacted by Carol Kenney, the Medical Center's Chaplain Coordinator, asking if Plaintiff was interested in volunteering as a chaplain at the Medical Center. (*Id.* at ¶ 16). As Plaintiff learned more about the chaplaincy program at the Medical Center, he became concerned by the lack of training, supervision, and qualifications of the volunteer chaplains. (*Id.* at ¶¶ 16-18).

Plaintiff began attending volunteer chaplain's meetings at the Medical Center, where he voiced some of his concerns regarding deficiencies in the program.  (*Id.* at ¶ 19).  Defendant Crittenden requested that Plaintiff "give a presentation about his

2

understanding of the role of a chaplain at a community-based hospital," and Plaintiff agreed.[1] (*Id.*). Plaintiff then spent over one hundred hours researching and preparing a plan "to revitalize the chaplaincy program" and "bring its procedures and policies in line with" pastoral care service standards (the "Plan"). (*Id.* at ¶ 21). Plaintiff asked Defendant Vogel to deliver the Plan to the Medical Center's board of directors, but she never did. (*Id.* at ¶ 22). However, she gave a copy to Helen Burroughs, who worked in the Medical Center's Performance Improvement Department. (*Id.* at ¶ 23).

Plaintiff gave a presentation entitled "What Does a Chaplain Do" at a February 11, 2016, volunteer chaplain's meeting. Plaintiff did not circulate the Plan at the meeting, but Ms. Burroughs brought a copy of the Plan to the meeting and shared information from it with Ms. Kenney. (*Id.*). Plaintiff had not authorized Ms. Burroughs or anyone at the meeting to copy or use the Plan without his consent. (*Id.*). Ms. Kenney and Plaintiff exchanged emails in late February 2016 wherein they planned to meet to discuss how to implement the Plan, but they postponed the meeting so that Defendant Crittenden could attend. (*Id.* at ¶ 24). The meeting never occurred. (*Id.*). Plaintiff continued

---

[1] The Amended Complaint does not make clear what Defendant Crittenden's role at the Medical Center was at that time. It also does not make clear the roles of Defendants Vogel and Weekley.

volunteering for the chaplaincy program for almost three years after that, and he heard nothing further from Medical Center personnel regarding his Plan. (*Id.* at ¶ 25). He was never "offered a paid position as a chaplain at the Medical Center, nor informed of any such employment opportunities." (*Id.*).

On August 11, 2018, Plaintiff attended a volunteer chaplain's meeting where it was announced that Defendant Crittenden had been hired as the Palliative Care Chaplain, a paid position "for which Crittenden was unqualified." (*Id.* at ¶ 26). Ms. Kenney stated at this meeting that Defendant Crittenden "had been very instrumental in establishing the Palliative Care program at the Medical Center." (*Id.*). Plaintiff "thereafter learned that the Defendants took actions to misappropriate his product to their own personal gain" and that the Plan "was plagiarized by these individuals in the process of creating the department's new Volunteer Chaplain Program," while giving credit to people other than him. (*Id.* at ¶ 27).

In particular, "Defendant Crittenden was at numerous times credited for being instrumental in the formation of the department's policies and guidelines, all of which were taken directly from the work of" Plaintiff. (*Id.*). Defendant "Crittenden was then able to parlay the misappropriation of [the] Plan into a paid Palliative Care Chaplain position, a position for which [Plaintiff] was not only vastly more qualified, but for which

4

he had laid the groundwork with his many hours of hard work on the program Plan." (*Id.* at ¶ 28).

On December 18, 2018, while Plaintiff was volunteering at the Medical Center, he noticed that his security pass had been deactivated. (*Id.* at ¶ 33). He was told that Defendants Weekley and Vogel had instructed that his access be terminated. (*Id.*). Plaintiff contacted the President and CEO of the Medical Center the next day, asking why his card was deactivated. (*Id.* at ¶ 34). On January 10, 2019, Plaintiff received a response from the Medical Center's Vice President of Human Resources, stating that his access was terminated for the following reasons:

> 1. Non-compliance with the Hospital's requirements as follows:
>
> a. Chaplains are required to be on the on-call schedule for six months. You were not.
> b. You did not get a flu shot, as required.
> c. You did not complete your Joint Commission competency training, as required.
> d. You did not complete your annual department training, as required.
>
> 2. Your behavior at the August[] 2018 meeting, when you were informed that non-compliance with the items noted above, made you ineligible for the coordinator position.
>
> a. As reported, you became irate and inappropriate. Even though you clearly have made very little, if any effort to comply with, and show some basic respect for our policies, you continued to assert that you should be allowed to be an officer in our Volunteer Chaplaincy Program, in spite of the group telling you that they wanted you on the

5

>    team, but you needed to meet the participation
>    requirements to be included.

(*Id.* at ¶ 35).  These assertions were all false.  (*Id.* at ¶ 36).

Defendants have filed a motion to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 18).

**II.  Standard of Review**

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A complaint need only satisfy the standard of Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).  However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must include more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Indeed, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

In determining whether a complaint states a plausible claim for relief, the court must consider all well-pleaded allegations in a complaint as true.  *See Albright v. Oliver*, 510 U.S. 266, 268 (1994).  The court is not, however, required to accept legal

conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

**III. Analysis**

Defendants have moved to dismiss all counts in the Amended Complaint for failure to state a claim upon which relief can be granted.  Plaintiff filed a response in opposition to the motion in which he moved for leave to file a Second Amended Complaint withdrawing his claims for copyright infringement (Count I), quantum meruit (Count III), and unjust enrichment (Count IV). (ECF No. 25-1, at 9).  That request will be granted, and those claims will be dismissed without prejudice.  Plaintiff's claims for tortious interference with prospective advantage (Count II) and violations of the First Amendment and Maryland Declaration of Rights (Counts V and VI) remain.

As a preliminary matter, Defendants argue that Plaintiff's allegation in his complaint that the Medical Center is a "component and arm" of Defendant UMMS is "fatally ambiguous" in that it does not provide a basis for attributing the Medical Center's actions to UMMS.  (ECF No. 18-1, at 6).  They also argue that Plaintiff has failed to "allege that Defendants Crittenden, Vogel, or Weekley represented, were employed by, or otherwise served as an agent of UMMS."  (*Id.*).  Defendants' points are well-taken; there is significant ambiguity in the Amended Complaint as to the roles and relationships of all the Defendants and how the individual

7

Defendants' actions, and those of the Medical Center, can be attributed to UMMS. Defendants have referred to irrefutable documentation of the separate corporate status of University of Maryland Charles Regional Health, Inc. and University of Maryland Medical System Corporation, (ECF No. 31, at 14-15), belying Plaintiff's assertion that the "University of Maryland Charles Regional Medical Center . . . is not an incorporated entity but rather, a component and arm of" UMMS. (ECF No. 25-1, at 2). If the two entities are separate corporations, Plaintiff would need to allege a relationship between them sufficient to justify imputing liability for the Medical Center's actions to UMMS, and he has failed to do so. For that reason alone, the complaint is likely subject to dismissal as to UMMS. The complaint is also woefully deficient in specifying the capacities of the individual Defendants or whether any were acting as agents of the Medical Center or UMMS at the time of any alleged wrongdoing. More significantly, however, the Amended Complaint falls well short of alleging facts sufficient to state a claim.

### A. Tortious Interference with Prospective Advantage

Only UMMS and Defendant Crittenden are named in this count. Plaintiff asserts that Ms. Crittenden committed tortious interference with Plaintiff's prospective advantage when she "made statements to the Medical Center and took actions to induce the Medical Center to employ Crittenden rather than" Plaintiff, using

8

"improper means to accomplish this goal by taking improper credit for and appropriating [Plaintiff's] Plan."[2] (ECF No. 17 ¶ 51-52). Defendants argue that Plaintiff has failed to state a plausible claim for tortious interference with prospective advantage because Plaintiff had no reasonable expectation of a business relationship—employment—with the Medical Center. (ECF No. 18-1, at 17). Defendants point out that Plaintiff did not allege that he ever applied or was under consideration for the Palliative Care Chaplain position or any other position of employment with the Medical Center or UMMS. (*Id.* at 17, 20).

Under Maryland law, a tort action for interference with prospective advantage, or interference with business relationships, generally comes in two forms: "inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635,

---

[2] Because UMMS was the party with whom Plaintiff hoped to have a business relationship, he cannot bring a tortious interference claim against UMMS. *See K & K Mgmt., Inc. v. Lee*, 316 Md. 137, 154-56 (1989) (explaining that tortious interference with economic relationships must have been committed by someone who was not a party to the economic relationship); *see also* Restatement (Second) of Torts § 766B (Am. Law Inst. 1979) (emphasis added) ("One who intentionally and improperly interferes with *another's* prospective contractual relation . . . is subject to liability to the other [when] the interference consists of (a) inducing or otherwise causing a *third person* not to enter into or continue the prospective relation or (b) preventing the *other* from acquiring or continuing the prospective relation.").

650 (1994) (internal quotation marks omitted). Because no existing contract was alleged, Plaintiff's claim falls under the second category. To succeed on such a claim, the following elements must be established: "(1) intentional and wil[l]ful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Id.* at 652 (internal quotation marks omitted).

Importantly, the plaintiff "must identify a possible future relationship which is likely to occur, absent the interference, with specificity." *Baron Fin. Corp. v. Natanzon*, 471 F.Supp.2d 535, 546 (D.Md. 2006) (deriving this principle from Maryland case law, the case law of a majority of other state courts, relevant federal case law, the Restatement (Second) of Torts, and treatises); *Mixter v. Farmer*, 215 Md.App. 536, 549 (2013) (relying on *Baron* for this principle); *see also* Reporter's Note to the Restatement (Second) of Torts § 766B cmt. g (Am. Law Inst. 1979) ("Loss of prospective contractual relation must be proved with reasonable certainty.").³

---

³ Although the Supreme Court of Maryland has yet formally to adopt this rule, it is difficult to imagine how the elements of the tort could be proven without the prospective contractual relationship being probable or likely. For example, there could be no "actual damage and loss resulting" from a defendant's

10

Here, Plaintiff has not alleged that his employment with UMMS or the Medical Center was likely to occur. He has not alleged that he ever applied for any job at the hospital, or that he was under serious consideration for any job. To the contrary, he alleges that "he was neither offered a paid position as a chaplain at the Medical Center, nor informed of any such employment opportunities." (ECF No. 17 ¶ 25).

Plaintiff argues in his opposition to Defendants' motion that the statement by the Vice President of Human Resources quoted in the Amended Complaint indicates that he was considered for a position at the Medical Center. (ECF No. 25-1, at 12). The statement was that Plaintiff was informed at the August 2018 meeting that his non-compliance with the Medical Center's requirements made him "ineligible for the coordinator position." (ECF No. 17 ¶ 35). This argument is unpersuasive for a few reasons. First, the quoted statement is weak support for the contention that Plaintiff was under serious consideration for any position at the hospital. More realistically, it indicates that he was *not* under consideration because of his ineligibility. Second, even assuming it does indicate that Plaintiff was being seriously considered for a "coordinator position," this appears to be different from the "Palliative Care Chaplain" position for which

---

interference with a prospective business relationship if the relationship was not likely to occur.

11

Case 8:21-cv-02023-DKC   Document 32   Filed 05/12/23   Page 12 of 16

Defendant Crittenden was hired. Indeed, Plaintiff alleges that Defendant Crittenden's hiring was announced at that meeting, which would indicate that the Medical Center was not still considering other candidates for that position at that time. Thus, an allegation that Plaintiff's eligibility for a "coordinator position" was discussed at the August 2018 meeting is irrelevant to Plaintiff's tortious interference claim that, as alleged in the Amended Complaint, is based on Defendant Crittenden's efforts to "induce the Medical Center to employ Crittenden rather than" Plaintiff.

There are other logical inconsistencies and missing facts in the Amended Complaint that make Plaintiff's tortious interference claim implausible on its face. For one, the Amended Complaint is very clear about who had access to Plaintiff's Plan, and it never alleges that Defendant Crittenden had access to a copy. Plaintiff gave a copy to Defendant Vogel, who gave a copy to Ms. Burroughs and possibly Ms. Kenney, but not Defendant Crittenden. (ECF No. 17 ¶ 22-23). Then, a meeting was scheduled for Plaintiff to discuss the Plan with Defendant Crittenden and Ms. Kenney, but that meeting never occurred. (*Id.* at ¶ 24). Although not explicitly alleged, Defendant Crittenden may have attended Plaintiff's presentation entitled "What Does a Chaplain Do," but the Amended Complaint makes clear that Plaintiff "did not circulate the Plan in the meeting" where he gave that presentation. (*Id.* at

12

¶ 23). Thus, it is unclear from the facts alleged how Defendant Crittenden could have "appropriat[ed] [Plaintiff's] Plan" to secure the Palliative Care Chaplain position. The Amended Complaint also does not contain any facts to support Plaintiff's allegation that Defendant Crittenden "made statements" and "took actions" with the purpose of interfering with the Medical Center's hiring of Plaintiff for that position.

For all these reasons, Plaintiff has failed to allege enough facts to state a claim for tortious interference with prospective advantage that is plausible on its face. That claim will be dismissed.

### B. First Amendment and Maryland Declaration of Rights

Plaintiff's claims under the First Amendment to the United States Constitution (as applied to the states and their political subdivisions under the Fourteenth Amendment and pursuant to 42 U.S.C. § 1983) and the Maryland Declaration of Rights are claims that "Defendants retaliated against Plaintiff for exercising his rights to protected speech." (ECF No. 17 ¶¶ 64, 68). Specifically, Plaintiff alleges that Defendants "deprived Plaintiff of his right to continue as a chaplain for the Medical Center and to engage in protected speech." (*Id.*). While these counts argue that "Defendants" retaliated against Plaintiff, the prayer for relief in each count names only UMMS. Defendants argue that Plaintiff has failed to state a claim for violation of his

13

free speech rights under either federal or state law because he has identified no protected speech that Defendants abridged. (ECF No. 18-1, at 26).

The Supreme Court of Maryland has held that the free speech protections accorded by the Maryland Declaration of Rights "are generally coextensive with the protections accorded by the First Amendment." *Newell v. Runnels*, 407 Md. 578, 608 (2009) (internal quotation marks omitted). Thus, the following analysis applies to both claims.

In general, a public official "may not respond to constitutionally protected activity with conduct or speech that would chill or adversely affect this protected activity." *McClure v. Ports*, 914 F.3d 866, 871 (4th Cir. 2019) (brackets and internal quotation marks omitted). To succeed on a free speech retaliation claim, "a plaintiff must show: (1) the speech was protected, (2) the alleged retaliatory action adversely affected the protected speech, and (3) a causal relationship existed between the protected speech and the retaliation." *Id.* (brackets and internal quotation marks omitted).

Here, the Amended Complaint fails to state a claim of free speech retaliation because it does not identify the speech that is the subject of those claims. Thus, Plaintiff's statement that his "speech" was "protected" is merely conclusory. Plaintiff indicates in his opposition to Defendants' motion that the speech

14

for which he was retaliated against was his criticism of the practices and policies of the Medical Center's volunteer chaplaincy program. (ECF No. 25-1, at 13). A plaintiff may not amend his complaint through a response to a motion to dismiss. *See Zachair, Ltd. v. Driggs*, 965 F.Supp. 741, 748 n.4 (D.Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

In any event, even if the Amended Complaint had identified that speech as the basis for Plaintiff's claims, the facts alleged in the Amended Complaint do not support a plausible causal relationship between the speech and Plaintiff's removal from the volunteer chaplaincy program. First, there is no temporal connection between the two events—according to the Amended Complaint, Plaintiff last engaged in discussions with Medical Center personnel about his Plan in February 2016, and he was dismissed from the program in December 2018, almost three years later. (ECF No. 17 ¶¶ 24-25, 29-35). Second, it is implausible that Defendants would, as Plaintiff alleges, plagiarize Plaintiff's ideas and use them to reform the Medical Center's policies while also retaliating against Plaintiff for voicing those ideas. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 358 (4th Cir. 2000) (holding that the defendant's actions "to remedy the safety problems identified by" the plaintiff "certainly reinforce[d] the [defendant's position] that the substance of the [plaintiff's] allegations was unrelated to the

15

sanctions later imposed."). Plaintiff alleges no other facts that would indicate a causal connection between the voicing of his opinions and his removal from the program.

Thus, Plaintiff has failed to state a plausible claim for relief under the United States Constitution or the Maryland Declaration of Rights based on a violation of Plaintiff's free speech rights. Those claims will also be dismissed.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss will be granted. Defendants argue that Plaintiff should not be afforded an opportunity to amend his complaint for a second time. (ECF No. 31, at 3). The court harbors serious doubt as to Plaintiff's ability to allege facts sufficient to remedy the defects identified in this opinion. Nevertheless, because this is the first ruling by the court on the merits of Plaintiff's claims, he will be afforded an opportunity to file a motion for leave to file a second amended complaint within twenty-one (21) days, should he seek to do so. No extension of time will be considered. A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge